IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| **BOBBY REED and MELISSA REED,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **vs.** | : | **3:03-CV-111 (CAR)** |
| | : | |
| **CITY OF LAVONIA; EDWIN A.** | : | |
| **MAISONET, JR., Individually and a** | : | |
| **Police Officer of the City of Lavonia; and** | : | |
| **BRUCE CARLISLE, Individually and** | : | |
| **a Police Officer of the City of Lavonia.** | : | |
| | : | |
| **Defendants.** | : | |

_____

## *ORDER ON MOTIONS FOR SUMMARY JUDGMENT*

This case arises out of the seizure and arrest of Plaintiff Bobby Reed following a routine traffic stop on I-85 in Franklin County, Georgia. During the course of Plaintiff's arrest, two City of Lavonia police officers, Defendants Edwin A. Masionet, Jr. and Bruce Carlisle, employed physical force which resulted in serious injuries to Plaintiff and necessitated the surgical removal of his left testicle.

Plaintiff and his wife Melissa Reed subsequently filed the present action pursuant to 42 U.S.C.A. § 1983 and Georgia law. Bobby Reed claims that Officers Masionet and Carlisle used excessive force during his arrest, thereby violating his rights as guaranteed by Fourth Amendment of the United States Constitution and committing the state-law offenses of battery and intentional infliction of emotional distress. He likewise seeks to impose liability on the City of Lavonia, Georgia for the negligent hiring, retention, and supervision of Officer Masionet. Plaintiff Melissa Reed also asserts her own state-law

claims of assault and loss of consortium against the individual defendants for injuries arising out of her husband's arrest.[1]

Currently at bar are Defendants' motions for summary judgment [Docs. 32 & 50]. Plaintiffs filed a timely response to each motion [Docs. 67 & 75], and Defendants thereafter filed timely briefs in reply [Doc. 79 & 87]. Plaintiff, with leave of the Court, further filed a sur-reply brief [Doc. 86] to Defendant Masionet's motion. Having considered these briefs, the evidence presented, and the relevant law, the Court finds, for the reasons stated below, that Defendants' motions for summary judgment are due to be **GRANTED** in part and **DENIED** in part.

## STANDARD ON SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). However, not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or,

---

[1] Plaintiffs' claims against formerly named Defendants Franklin County and Franklin County Sheriff's Deputy, Brandon Coleman, were voluntarily dismissed on February 7, 2005 [Doc. 55]. The status of Plaintiffs' claims against named Defendant "John Doe" (Count VII of the Complaint) are unclear. If not previously voluntarily dismissed, however, the Court will **DISMISS** any remaining claims against the John Doe defendant, as Plaintiffs have apparently failed to learn his identity during a full discovery period.

in other words, if reasonable minds could not differ as to the verdict.  See id. at 249-52. In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex, 477 U.S. at 323.

**FINDINGS OF FACT**

On Christmas night, December 25, 2001, Plaintiff Bobby Reed (herein "Reed") and his wife Melissa were traveling northbound on Interstate-85 in Franklin County, Georgia, when they were stopped by a Franklin County deputy sheriff at approximately 7:12 p.m. Upon seeing the deputy's blue lights, Bobby Reed, the driver, immediately pulled his vehicle off the roadway, turned off his ignition, activated his emergency flashers, and rolled down his window. The passenger-side tire of the pick-up truck was on the grass approximately five feet from the white line marking the emergency lane of the interstate. Reed had not consumed any alcohol or ingested any other intoxicating substances that day.

The deputy sheriff approached the driver's side window and requested to see Reed's license and insurance. Reed complied and was then informed that he had been stopped for speeding. The posted speed limit on that stretch of the interstate was 70 mph; the deputy claimed that Reed's speed registered at 91 mph. Reed requested to see the deputy's radar[2] because he did not believe that he was speeding. The young deputy responded "I don't have to show you shit" and began walking back towards his vehicle. At this point, Reed exited his truck and demanded that he be permitted to see the radar. The deputy turned and added "I say you were speeding, so you were speeding. I don't have to show to you shit." A confrontation then ensued, and Reed was suddenly struck in the face by the deputy's right hand. Reed returned to his truck, told his wife, Melissa, who was seated in the front passenger seat, what had happened, and phoned his mother-in-law on his cell phone.

---

[2] Reed believed that the deputy had utilized a radar speed detection device when in fact the deputy had used a laser device.

At some point during these events, the deputy issued a call over the police radio for a "10-78" meaning "officer needs assistance."  A short time later, a second call for a "10-18," which is an "urgent call for assistance" was made.  It is disputed as to whether the deputy who stopped Reed made this second call or whether it was made by another deputy.  Regardless, Officers Masionet and Carlisle, with the City of Lavonia police department, were then on duty, heard these calls, and testified that, at the time, they believed both calls to have been made by the same deputy. Masionet and Carlisle were personally acquainted with the young and inexperienced deputy who stopped Reed and raced to the scene in their individual police cruisers to assist him.  It is undisputed that the deputy never specified why he needed assistance or even the circumstances of the stop when he made the radio call for assistance.  As such, neither Officers Masionet nor Carlisle were aware of any events preceding their arrival to the deputy's location or knew what offense Reed was suspected of committing.

Also unbeknownst to the officers,[3] their actions upon arriving at the scene were caught on video tape by a camera mounted in Officer Carlisle's patrol vehicle.[4]  Carlisle was the first to appear on scene; Masionet followed shortly thereafter.  Upon their arrival, Reed was seated in his truck.  The ignition was turned off, and Reed's hands were displayed across the steering wheel. Officer Carlisle immediately approached Reed, withdrew his

---

[3] Officer Masionet's camera was inoperable that evening, and Officer Carlisle testified that he was entirely unaware that his camera was recording the events.

[4] The proper interpretation of what the video shows is, of course, disputed. Because this Court is required to view all facts in the light most favorable to Plaintiffs on summary judgment, the Court will accept Plaintiffs' explanation of events to the extent that a jury could reasonably find that Plaintiff's interpretation of the events shown on the tape are correct.

5

pepper spray, and discharged it.  At this point, Reed was still seated, and Carlisle had not spoken to the deputy.

One of the officers ordered Reed to get out of the truck.  He voluntarily complied, as they attempted to jerk him out, and exited the truck with his hands in the air - so as to surrender.  Officer Carlisle then deployed pepper spray a second time.  Reed, with his arms raised, attempted to shield his face.  Officer Masionet testified that raising one's hands and attempting to shield the face was a normal response by someone hit with pepper spray.

The officers were then yelling commands at Reed; he was ordered to "get up against the truck."  As he turned to do so, Reed felt someone grab him from behind.  Officer Carlisle in fact grabbed Reed, having him in a choke-hold and by the arm, and began commanding him to "get on the ground" and to "give me your hands."  Masionet arrived and began yelling "get down" and "get your hands back."  Reed concedes that he did not comply with these commands but testified that he was unable to comply because both officers were holding him and he had no control over his body.  Reed further testified that he was not resisting the officers and that he did not yell or curse at the officers; he only complained that he could not breathe because of their physical restraints.

Seconds after Reed had been sprayed a second time by Carlisle, Officer Masionet withdrew his ASP baton and began striking Reed on his legs and possibly in his groin area.  Many of these strikes were delivered without an interval in between to determine whether there was compliance.  Reed was finally thrown to the ground; he still was not resisting the officers. Carlisle kept a choke hold on Reed as he laid on the ground, and Masionet delivered another seven or so strikes to Reed's legs and/or groin area.  At least one, if not

more, of the blows delivered by Masionet struck Reed between his legs, injuring his testicles.

These events were witnessed by Melissa Reed and her mother, who was still on the cell phone-line and could hear the comments made and the strikes of the baton on Reed's body.  While witnessing the use of force, Melissa Reed screamed "Leave my husband alone. He is not resisting."  The entire event involving Carlisle and Masionet occurred over a period of just under 40 seconds and in the emergency lane of the interstate.  Reed was ultimately arrested and taken for medical care.[5]  After examination, it was determined that Reed had suffered a "fracture of the left testicle with multiple areas of intratesticular hemorrhage."  Reed was admitted for surgery and his left testicle was removed.  Thereafter, Reed plead *nolo contendere* to charges of speeding and felony obstruction of a law enforcement officer.

Following this event, neither Masionet nor Carlisle were disciplined with respect to their use of force in this case.  The City of Lavonia, however, was aware that Masionet had been subject to disciplinary complaints and action prior to this event.  Masionet was hired by Chief Randy Shirley of the City of Lavonia Police Department in December of 1999.  He had previously been employed by three other law enforcement agencies before being hired by the City and had actually been fired from two of those previous positions for disciplinary infractions.

---

[5] Reed previously stated a denial of medical care claim, (See Count IV of the Complaint [Doc. 1]), but he has since dismissed that claim.

Masionet's first law enforcement position was with the University of Georgia Police Department in Athens, Georgia in 1985. He served as a university police officer for approximately fourteen months before being terminated for "conduct unbecoming" an officer after he lost his temper with a student. The student had apparently made some remark to Masionet about having him fired, which provoked Masionet to yell "I don't [give] a shit. You can have your damn job" and to throw his police issued name plate at the student, striking the student in the stomach. After his termination, the Georgia Peace Officer Standards and Training Counsel suspended Masionett's Peace Officer Certification for one year and placed Masionet on probation for two years. Masionet subsequently returned to his home in California where he worked as a car mechanic at various car dealerships until returning to Georgia in 1989.

In August of 1989, Masionet was hired in his second law enforcement position by the City of Commerce Police Department as a patrol officer. While employed by the City of Commerce, a use of force complaint was filed against Masionet after the staff at a local hospital reported to authorities that a suspect had been beaten. The suspect had been involved in an automobile accident and fled the scene with a little over half an ounce of crack cocaine in his possession. The suspect was ultimately tackled, arrested, and sent for medical care. Masionet admits that the suspect alleged Masionet "broke his face." The incident was investigated and taken to a grand jury, but no indictment was returned. In fact, no disciplinary action was taken against Masionet as a result of this complaint. Masionet nevertheless resigned from his position with the City of Commerce shortly thereafter.

8

A month later, in May of 1996, Masionet was hired by the City of Jefferson Police Department.  While employed by the City of Jefferson, Masionet was again subject to a "use of force" investigation.  On November 9, 1997, Masionet became involved in a fight with an individual suspected of driving under the influence.  When the unarmed individual ran away, Masionet fired three or four shots, striking the suspect once.  Following the incident, an investigation was conducted by the Georgia Bureau of Investigation ("G.B.I."). The victim reported to the G.B.I.,

> I remember that right after I broke free from the police officer, him saying to me, "Stop or I'll shoot." I had thrown up my hands and said, "I don't have nothing."  It surprised me that he shot since I did not have a gun. I never tried to get the police officer's gun.  I never hit the police officer.

However, the use of force exercised by Masionet was officially determined to have been justifiable and no discipline was administered in response to this complaint.

Masionet had additional disciplinary problems while employed by the City of Jefferson.  An incident report was filed by his supervisor in July of 1998, after Masionet was observed playing golf three times while supposedly on workers compensation leave. When he was approached by his Lieutenant about this report, Masionet responded that the Lieutenant should "contact his attorney."  A year later, in October of 1999, Masionet was terminated from his position with the Jefferson Police Department for "insubordination" when he failed to obey a direct order from his supervisor to prepare a report on an arrest. In response to the order, Masionet remarked, "I'm going on vacation. Kiss my ass.  Have a good day."  Because this represented the second incident of insubordination, Masionet was fired when he did return from vacation.

The next month, in November of 1999, Masionet filed an application for employment with the City of Lavonia Police Department.  Prior to hiring Masionet, Chief Shirley performed a limited background check.  From the application, Shirley was aware of Masionet's employment history.  Shirley, however, did not contact the University of Georgia Police Department to inquire about the reasons for Masionet's termination or inquire from the Commerce Police Department as to why Masionet left that position or as to whether Masionet had been subject to any disciplinary action or investigations there.  Chief Shirley did contact the Chief of Police for the City of Jefferson, Darren Glynn, and learned the reasons for Masionet's termination from that position. Shirley further learned that Glynn would not recommend Masionet for employment.

Chief Shirley additionally investigated Masionet's background by performing a search through the Georgia Crime Information Center ("GCIC") and contacting the Georgia Peace Officer Standards and Training Council.  These inquires showed that Masionet had no criminal back ground history and that there were no then pending investigations against Masionet.  Shirley did not, however, perform any further back ground investigation or seek written employment records.  Shirley additionally chose not to contact the G.B.I. with respect to the "use of force" investigation conducted in 1997 but accepted Masionet's version of the investigation and events.

With respect to his medical and physical profile, Shirley administered a voice stress analysis and inquired into Masionet's health history.  Masionet was not required to take any polygraph, psychological, or mental examination.  And while Chief Shirley learned that Masionet was routinely taking pain medication for a back injury, Shirley never investigated

the type of medication Masionet was taking or whether this medication would affect his ability to perform his duties as a patrolman.

Thus, despite Masionet's prior negative employment history and possible medical issues, Chief Shirley ultimately decided that Masionet's "positives outweigh the negatives." Shirley considered  Masionet's "positives" to be his former training and ability to speak Spanish fluently.  In December of 1999, Masionet was hired, on a probationary status, as a patrol officer and interpreter for the City of Lavonia Police Department.  No disciplinary action was taken against Masionet during the six-month probationary period, and he was made permanent thereafter.

Two years later, Masionet was subject to disciplinary action in November of 2001 and charged with "conduct unbecoming [an officer], dereliction . . .of duty, and leaving assigned area without notifying communications." This action resulted after it was discovered that Masionet had been visiting with a female friend during working hours.  She apparently lived five miles outside the City of Lavonia.  As a result, Masionet was placed on six months of probation and warned that another incident of similar nature could jeopardize his job.  Masionet was still on probation when the incident with Plaintiff Reed occurred in December of 2001.

Chief Shirley was also aware that the City of Lavonia had not provided any training for Officer Masionet with respect to the appropriate use of the ASP baton. Masionet, however, did receive formal training regarding the use of force and the ASP baton before he was hired by the City.  The official policy of the City of Lavonia in fact permits an officer to carry and use an ASP baton if he is properly certified by either a training officer

or the Forsyth Training Academy in its use.  Officer Masionet testified that he had received

ASP training and was awarded a training certificate from ASP itself prior to this incident.

At the time of Reed's arrest, Chief Shirley was additionally aware that he had not

enforced his own policy with respect to the use of video and audio devices during traffic

stops. The City had a written policy addressing the use of such equipment.  According to

this policy "all video cameras installed in Departmental vehicles will be active whenever

the emergency lights are activated and will remain operational until emergency lights used

are disconnected or until the system is manually overridden."  The policy further requires

that all officers "ensure that the audio is activated whenever the camera is recording." Chief

Shirley also wrote memorandums reminding all officers to activate their video and audio

devices when making traffic stops and threatening that a failure to do would result in

"extreme consequences."

Yet, Shirley failed to issue any discipline related to the use (or misuse) of the

equipment and knew that video devices mounted in patrol cars were often not working

when officers were making traffic stops.   In fact, at the time of the incident in question,

Officer Masionet's video camera was inoperable.  Masionet accordingly knew that his

video equipment would not be recording his actions that evening. Officer Carlisle's camera

was operable, but he did not intend to have it on during the events involving Reed, and

testified that he was entirely unaware that their actions were being recorded.  Carlisle

additionally admitted that while his audio recorder was also working that evening, he did

not turn it on prior to arriving on scene.  As a result, there is no audio recording of the

incident involving Reed.

# CONCLUSIONS OF LAW

Through the present action, Plaintiff Bobby Reed seeks to recover, via 42 U.S.C. § 1983, against Officers Masionet and Carlisle, both individually and in their official capacities as police officers for the City of Lavonia, for violations of his Fourth Amendment right to be free from the use excessive force during arrest.  Reed likewise seeks to hold the City of Lavonia liable under §1983 for negligent hiring, retention, and supervision of Officer Masionet.  Both Plaintiffs additionally allege state-law claims in the Complaint. Bobby Reed asserts pendent state-law claims of battery and intentional infliction of emotional distress, and Melissa Reed has stated claims for assault and loss of consortium.  Each of these claims will be discussed in turn below.

## A.  Count I - Excessive Force

### 1.  *Individual Capacity Claims.*

Count I of Plaintiffs' Complaint [Tab 1], asserts that Officers Masionet and Carlisle "used excessive force during the arrest and seizure of [Bobby Reed]" in violation of the Fourth Amendment of the United States Constitution.  Defendants Masionet and Carlisle have asserted the affirmative defense of qualified immunity with respect to these claims. "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quote omitted).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of

personal liability or harassing litigation." Id. at 1194.  Thus, where a public official was acting within the scope of his discretionary authority at the time of an alleged wrongful act,[6] the plaintiff has the burden of showing that the defense of qualified immunity is not appropriate.  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

This analysis involves a two-step examination. "As a 'threshold question' a court must ask, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right ?'" Lee, 284 F.3d at 1194 (quoting Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001)).  "If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine 'whether the right was clearly established'" at the time of the alleged violation.  Id.

Accordingly, this Court must first decide whether the facts, when taken in the light most favorable to Plaintiffs, show that Officers Masionet and Carlisle's conduct violated Reed's constitutional right to be free from the use of excessive force.  Certainly, "the right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Yet, it is equally well-settled that *excessive* physical force during the course of an arrest, investigatory stop, or other seizure of a person violates the Fourth Amendment of the United States Constitution and that such claims are properly analyzed under the Fourth Amendment's reasonableness standard.  Graham, 490 U.S. at 396.

---

[6]
It is undisputed in this case that Officers Masionet and Carlisle were acting within the scope of their discretionary authority at the time of the Reed's seizure and arrest.

14

"<u>Graham</u> dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." <u>Lee</u>, 284 F.3d at 1197.

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

<u>Graham</u>, 490 U.S. 386 at 396 (internal quote omitted).  The Eleventh Circuit Court of Appeals further encourages district courts to examine "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, and (3) the extent of the injury inflicted." <u>Draper</u>, 369 F.3d at 1277-78 (quoting <u>Lee</u>, 284 F.3d at 1198)).

Of course, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," and not with the benefit of 20/20 hindsight vision." <u>Graham</u>, 490 U.S. at 396.  The "reasonableness inquiry" is also an objective one. <u>Id.</u> at 397.  That is, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances [then] confronting them, without regard to their underlying intent or motivation." <u>Id.</u>  "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" <u>Lee</u>, 284 F.3d at 1197 (citing <u>Willingham v. Loughnan</u>, 261 F.3d 1178, 1187 (11th Cir. 2001)).  Most importantly, in any case, "[t]he calculus of reasonableness must embody

15

allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Here, Defendants adamantly contend that the amount of force used in this case was reasonable because of Reed's aggressive behavior and refusal to comply with the officers' commands.  However, at the summary judgment stage of litigation, this Court must accept Plaintiffs' version of the facts, and based on Plaintiffs' account of events, the Court finds that Plaintiff has sufficiently raised a material issue as to whether the use of force in this instance was excessive.

It is undisputed that Reed's seizure initially arose out of a routine traffic stop.  Reed was suspected of the minor crime of driving 91mph in a 70mph zone.  He was not suspected of a violent crime and was apparently only subject to arrest after the deputy determined that he had committed the offense of "obstruction" of a law enforcement officer.   Yet, even if Plaintiff was properly subject to arrest for felony obstruction, accepting Plaintiff's facts as true, neither Masionet nor Carlisle witnessed any acts of obstruction when they appeared on scene.

According to Reed's testimony and his interpretation of the video evidence, he was seated in his truck and non-agressive when the officers arrived.  Reed was not intoxicated or armed.  He was not attempting to flee, reach for the officer's weapons, or otherwise attack the officer attempting to arrest him.  Reed was nevertheless sprayed with pepper spray when Officer Carlisle first arrived. Upon demand and after having been sprayed, Reed voluntarily exited the vehicle with his arms raised - in an attempt to surrender.  As

he exited the truck, Carlisle sprayed him a second time, and Reed moved his arms in an effort to shield his face - almost instinctively - as the officers simultaneously shouted commands at him.  Officer Carlisle then jumped on Reed, placing him in a choke-hold, as Masionet reached Reed and began using his baton to beat Reed about the legs and groin area.   According to Reed, he was not resisting the officers and complied with their commands to the extent that he was physically able.  At no time during these events was Reed belligerent; he testified that he did not yell, curse, or say anything to the officers other than to complain that he could not breathe due to the choke-hold.  If these facts are accepted as true, a rational jury could determine that, given the circumstances, no reasonable officer would have believed that Reed posed an immediate threat to the officers (or members of the public) or was actively attempting to resist or evade arrest.

On summary judgment, Defendants attempt to justify thier actions by arguing that the events at hand were rapidly evolving in the dark on the side of an interstate.  They assert that Reed did resist and did pose an immediate threat to the officers because he could have, at any point, pushed the officers into the high-speed interstate traffic.  Defendants are, of course, correct that, as stated above, the choices made by Officers Masionet and Carlisle should not be examined with the benefit of 20/20 hindsight vision; on summary judgment, the Court must allow for "the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97.

Even so, the Court finds that, in the present case, the question of whether Masionet and Carlisle could have reasonably believed that Reed was actively resisting arrest and

posed an immediate threat of danger to them (under the circumstances presented) is one for the jury to determine.  Based on the video and testimonial evidence presented by Plaintiffs, a jury could find that Reed was not resisting arrest, that little traffic was passing as the officers attempted Reed's arrest, and that any traffic had in fact slowed significantly as it passed them - likely due to the flashing lights of the numerous police cars sprawled along the interstate.  A jury could likewise opine that the events were rapidly escalating due to immediate and extreme actions taken by Masionet and Carlisle themselves - and not due to any resistance or threat posed by Reed.  In other words, the Court finds that a rational jury could determine that no reasonable officer would have felt Reed posed an immediate threat of danger, that there was no need for the force employed, and that, in light of the severe injury suffered by Reed, the level of force applied by Masionet and Carlisle was ultimately not warranted.

Thus, having considered the facts in the light most favorable to Plaintiff, this Court finds that Plaintiffs have successfully raised a material issue of fact as to whether "a reasonable officer" would have believed that the level of force employed in this instance was excessive, unnecessary or disproportionate so as to violate the Fourth Amendment of the U.S. Constitution.  Under the first prong of the qualified immunity test, therefore, Plaintiff has made a sufficient showing of excessive force in violation of the Fourth Amendment, and granting summary judgment on this issue would not be appropriate. Compare Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) (holding that defendants were not entitled to judgment as a matter of law where plaintiff had produced substantial evidence that the use of force was objectively unreasonable); Vaughan

18

v. Cox, 343 F.3d 1323, 1330-1331 (11th Cir. 2003) (reversing grant of summary judgment where plaintiff's version of the facts raised a genuine question as to whether his flight presented an immediate threat of harm to the officers or others).

However, that is not the end of this Court's inquiry.  Even if Masionet and Carlisle used unreasonable and unnecessary force during Reed's arrest, they may "nevertheless be shielded from liability for civil damages if [their] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002) (quotes omitted). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Id. at 2515-16.  Thus, "[b]efore qualified immunity is surrendered by an officer, he or she is entitled to fair and clear warning that the challenged conduct violates federally protected rights." Kesinger v. Herrington, 381 F.3d 1243, 1250 (11th Cir. 2004).

Factually similar cases are "usually . . . needed to demonstrate that officials were fairly warned that their application of force violated the victim's constitutional rights." Willingham, 321 F.3d at 1303; see also Vinyard, 311 F.3d at 1350-1353.  However,

> [b]ecause identifying factually similar cases may be difficult in the excessive force context [the Eleventh Circuit has] recognized a narrow exception also allowing parties to show that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official notwithstanding the lack of case law.

Lee, 284 F.3d at 1199 (quote omitted).

In this case, Defendants argue that, even if a constitutional violation is found, they are nonetheless entitled to immunity because it was not clearly established that Masionet and Carlisle's actions were unconstitutional at the time of Reed's seizure.  Defendants reason that just the opposite is true; they argue that the United States Court of Appeals for the Eleventh Circuit has actually found *no* constitutional violation in other cases where force was used against an arrestee who was belligerent, resistant, and refused to follow commands of officers.  See e.g., Draper, 369 F.3d at 1278 (finding no constitutional violation where arrestee was hostile, belligerent, and uncooperative).  This Court agrees that Defendants would be entitled to qualified immunity if those were the facts under consideration; yet, Plaintiffs' version of the facts paint a very different picture of events.

The facts, as set forth by Plaintiff, establish that he was seated in his truck at the time Masionet and Carlisle arrived on the scene.  The officers were aware that the deputy had called for assistance, but the officers had no knowledge of the circumstances of the stop or of any events occurring prior to their arrival. Reed testified that, when the officers arrived, he was not acting aggressively and not attempting to flee.  According to Reed, after he was first sprayed with pepper spray, he voluntarily exited the truck with his arms raised in a "surrender" position.  He was sprayed again and attempted shield his eyes. Officer Carlisle then grabbed Reed around the neck and by the arms as the officers simultaneously shouted commands for him to get on the ground.  Reed testified that he made every effort to comply with the officers commands, but that their physical restraints prevented him from doing so.  Reed was then beaten about the legs and groin until he was finally thrown to the ground.  Once on the ground, Reed was hit another seven or so times by Officer Masionet.

20

At no time during these events was Reed belligerent, uncooperative, or resistant to the officers' attempts to arrest him.

Given these facts, Defendants contend that they are still entitled to immunity because other Eleventh Circuit cases finding a constitutional violation in the excessive force context are not materially similar. Defendants particularly point to the fact that the arrestee in those cases had been handcuffed at the time force was used. See e.g., Vinyard, 311 F.3d at 1349 (finding constitutional violation where officer pepper sprayed a handcuffed arrestee); Lee, 284 F.3d at 1199 (denying qualified immunity where arrestee was handcuffed and completely secured); Slicker, 215 F.3d at 1233 (denying qualified immunity where officers beat and kicked handcuffed arrestee).

This Court does not necessarily agree with Defendants' narrow reading of Lee and Vinyard.[7] However, the Court must further note that neither of these cases, as relied on by the Defendants, may be considered in the present case for determining whether Officers Masionet and Carlisle had clear and fair notice that their actions were unconstitutional. Both Lee and Vinyard were decided by the Eleventh Circuit Court of Appeals long after the incident at bar occurred; thus, neither of these cases could logically have served as notice that the level of force employed was not constitutionally permissible. See Pelzer, 122 S.Ct.

---

[7] The Court finds that these cases, if properly considered, may have given the officers clear notice that thier actions would likely violate Reed's constitutional rights. In Lee, the Eleventh Circuit reasoned that slamming the arrestee's head into the trunk of her car was excessive force because, upon reviewing the plaintiff's version of the facts, there was "no indication that [she] actively resisted or attempted to flee" and was secured by the officer. 284 F.3d at 1198. In Vinyard the Circuit Court announced that "using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." 311 F.3d at 1348. The fact that the arrestees in these cases were already handcuffed is not a "material" difference.

at 2516 ("The salient question is whether the state of *the law at the time of the action in question* gave [the defendants] fair warning that their alleged actions were unconstitutional.") (emphasis added).

Having considered the other cases cited by Defendants, the Court finds that they also cannot be distinguished from the facts at bar "in a fair way." See Vinyard, 311 F.3d at 1352 (explaining that prior precedent may not serve as notice to officers if it can be distinguished "in a fair way").  These cases clearly notify officers that the use of force, particularly beating, is not constitutionally permissible where the arrestee is *not* attempting to flee or resist arrest and is compliant, subdued, and posing no threat to the officers or members of the public.  In Slicker, the Eleventh Circuit denied qualified immunity, where the officers beat and kicked the arrestee, by relying on the fact that the arrestee "did not struggle or resist the officers in any way."  215 F.3d at 1233.  In Smith, the Circuit Court similarly denied qualified immunity, where the officer broke the arrestee's arm, because the arrestee "was offering no resistance *at all*" to the officer's show of authority. 127 F.3d 1219-20 (emphasis in the original).  Notably, the arrestee in Smith, like Reed, was not yet handcuffed when the injury occurred.

In this case, even though Reed was not handcuffed, the facts, when viewed in the light most favorable to him, show that Reed was not attempting to flee, was not offering any resistance, and was not belligerent or uncooperative and that he attempted to comply with the officers commands.  If these facts are true, existing case law served as a clear and fair warning to Defendants Masionet and Carlisle that the use of force in such circumstances would violate an arrestee's Fourth Amendment rights.

22

Even assuming that existing case law did not provide Defendants with clear and fair notice that their acts, as alleged by Plaintiff, would violate Reed's Fourth Amendment right to be free of excessive force during arrest, the Court further finds that such decisional law is not necessarily required in this case.  As stated above, materially similar case law is not necessary if the officers' alleged conduct lies "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent . . . notwithstanding the lack of case law."  Lee, 284 F.3d at 1199.

Here, as discussed above, Reed was allegedly passive, compliant and cooperative when Officers Masionet and Carlisle arrived on scene, sprayed him with pepper spray, physically attacked him, and began beating him with the baton.  He was not intoxicated, did not possess (or appear to possess) a weapon, and made no attempt to flee or resist arrest. According to Reed, he surrendered to the officers' authority when they arrived and made every attempt to comply with the officers' commands. Even when Reed was on the ground, as the officers commanded, Masionet continued to beat him as Carlisle held him in a choke-hold, restricting his airflow and restraining his movement.  In these circumstances, "no particularized preexisting case law was necessary for it to be clearly established that what [Defendants Masionet and Carlisle allegedly] did violated [Reed's] constitutional right to be free from excessive force."  Priester, 208 F.3d at 927 (finding a constitutional violation, even absent materially similar caselaw, where the arrestee was wholly compliant, did not pose a threat of bodily harm to the officers (or anyone else), and was not attempting to flee or otherwise resist arrest).

23

For these reasons, the Court finds that Masionet and Carlisle are not entitled to the protection of qualified immunity. Defendants' motions for summary judgment are therefore **DENIED** as to Count I of the Complaint.

### 2. *Official Capacity Claims*.

Plaintiffs have also attempted to state a claim against Officers Masionet and Carlisle in their "official capacities" as police officers of the City of Lavonia. The Eleventh Circuit has recognized, however, that "when an officer is sued under Section 1983 in his or her "official capacity," the suit is simply another way of pleading an action against an entity of which the officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (internal quotation marks omitted); see also Owens v. Fulton County, 877 F.2d 947, 951 n.5 (11th Cir. 1989) (per curiam). "Suits against municipal officers are therefore, in actuality, suits directly against the [municipality] that the officer represents." Id.

Accordingly, the Court finds that Plaintiff's suits against Masionet and Carlisle in their "official capacities" are functionally equivalent to his §1983 claims against the City of Lavonia. These claims will be discussed below.

### B. Counts II & III - Negligent Hiring, Retention, and Supervision.

In Counts II & III of the Complaint, Plaintiff Reed seeks to hold the City of Lavonia liable for the injuries he suffered during his arrest (assumably under §1983) based on allegations of negligent hiring, retention, and supervision of Officer Masionet. (Compl. at ¶¶ 39-45). On summary judgment, the City of Lavonia contends that the claims stated

against it fail as a matter of law because Police Chief Randy Shirley may not be considered a final municipal policymaker for the purpose of imposing municipal liability under §1983 and that, even if the actions of Shirley could impose liability upon the City, there is no evidence that Shirley was deliberately indifferent to Reed's rights when he hired, supervised and retained Officer Masionet.

### 1. *Negligent Hiring & Retention Claims*.

As a preliminary matter, this Court agrees that the first inquiry to be made is whether the City of Lavonia may be held liable under §1983 for hiring and retention decisions made by Chief Shirley. Clearly, local governments or "municipalities," such as the City, are "persons," which may be sued pursuant to 42 U.S.C. § 1983. It is also well-settled, however, that a municipality cannot be held liable on the basis of *respondeat superior*. Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). A municipality can only be held liable under § 1983 when the execution of the municipality's official "policy" is responsible for "inflict[ing] the injury" incurred. Id. at 694. While "congress intended for municipalities to be liable for adopting and promulgating an unconstitutional policy," § 1983 was not intended to impose liability upon a municipality "merely because it employs a tortfeasor." Id. at 691; see also Mandel v. Doe, 888 F.2d 783, 791 (11th Cir. 1989).

"To be sure, 'official policy' often refers to the formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently over time." Pembar

v. City of Cincinnati, 475 U.S. 469, 480-81 (1986).  Such wide-spread plans of action are not, however, the only means of establishing municipal "policy."  See id.  In many cases, a government will choose "a course of action tailored to a particular situation and not intended to control decisions in later situations." Id. at 481.  These more isolated decisions may also represent an act of official government policy "[i]f the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers." Id.  This is true regardless of "whether that action is taken only once or to be taken repeatedly." Id.

Still, not every decision by a municipal officer will automatically subject the municipality to §1983 liability.  Id.  "Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." Id.  In as much, "[t]he fact that a particular official - even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion."  Id. at 481-82.  The United States Supreme Court has accordingly held that "municipal liability under §1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 482.

In this Circuit, the law is clear that "a municipal officer does not have policymaking authority over a particular subject matter [so as to impose §1983 liability on the municipality] when that official's decisions are subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997).  In other

words, the Eleventh Circuit Court of Appeals has interpreted Supreme Court precedent to "preclude §1983 municipal liability for subordinate official's decisions when the final policy maker delegates decision making discretion to the subordinate, but retains the power to review the exercise of that discretion. . . ." <u>Id.</u> at 1399; <u>see</u> <u>e.g.</u>, <u>id.</u> at 1402 (holding that city manager was not a final policy maker with respect to the decision to terminate an employee where the city's civil service board had the authority to review the city manager's decisions); <u>Hill v. Clifton</u>, 74 F.3d 1150, 1152 (11th Cir. 1996) (accepting concession that police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager); <u>Manor Healthcare Corp. v. Lomelo</u>, 929 F.2d 633, 637-38 (11th Cir. 1991) (holding that mayor was not a final policymaker regarding  zoning issues where the city counsel could override the mayor's veto of zoning ordinances); <u>Vincent v. City of Talladega, Ala.</u>, 980 F. Supp. 410, 419 (N.D. Ala. 1997) (finding that city was not subject to liability under §1983 where suspension decision was subject to review by the city's personnel board).

This caselaw thus begs the question whether Police Chief Randy Shirley may be considered "a policymaker possessing the final authority to establish policy" with respect to the hiring and retention of police officers for the City of Lavonia. For all practical purposes, "[i]f there is a review board with the power to take another look at the [Chief Shirley's hiring and retention] decision[s], [Plaintiffs] can forget suing the [C]ity under §1983." <u>Vincent</u>, 982 F. Supp. at 418.

Here, Reed seeks to impose liability upon the City of Lavonia for Chief's Shirley's actions in hiring and retaining Officer Masionet.  Reed argues that Masionet's previous

27

employment history provided Shirley with actual and constructive knowledge Masionet was predisposed to using excessive force during arrests and that Shirley further failed to properly discipline, and thereby negligently retained, Masionet after he was hired - despite disciplinary infractions committed.

It is not disputed, however, that the City of Lavonia's Employee Handbook and the Police Department's Policy and Procedures Manual both provide that all disciplinary action taken against City employees is subject to review through a City Grievance Procedure. Thus, apparently, any decisions made by Chief Shirley with respect to disciplinary action taken (or not taken) against Officer Masionet were subject to "meaningful administrative" review as contemplated by the Eleventh Circuit in Scala. It is further undisputed that, pursuant to the Charter for the City of Lavonia, "all non-department head employees are hired and fired by the City Council of the City of Lavonia, Georgia." Plaintiffs even concede that "the mayor and city counsel had authority to review [Shirley's] disciplinary and hiring decisions." (Pl.s' Brief in Response [Doc. 75] at 10).

In light of these undisputed facts, this Court must find that, as a matter of law, Chief Shirley may not be considered a "policymaker possessing the final authority to establish policy" with respect to the hiring, discipline, and retention of his officers. Obviously, the City allows Chief Shirley to make these hiring and disciplinary decisions on a daily basis; yet, as discussed above, this fact alone would not make Shirley the "final authority" on such decisions. "The delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegee." Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984). Here, because the City

undisputedly retains the power to review Chief Shirley's exercise of discretion in hiring and disciplining his officers, Shirley may not be considered "policymaker possessing the final authority" on such matters, so as to permit the imposition of municipal liability under §1983.  See Scala, 116 F.3d at 1399-1402.  Summary judgment in favor of the City with respect to these claims would therefore be appropriate.[8]

### 2. *Negligent Supervision Claims*.

Reed additionally seeks to impose liability upon the City of Lavonia for Chief Shirley's failure to adequately train Officer Masionet on the use of the ASP baton and failure to enforce his own policies with respect to the use of video and audio equipment during traffic stops.  Neither party as provided the Court with any information as to whether Shirley is the "policymaker possessing the final authority" with respect to these supervisory actions.  The Court will therefore assume that it is undisputed that he is.

Still, "it is not enough for a §1983 plaintiff to merely identify conduct properly attributable to a municipality. The plaintiff must also demonstrate that, through its

---

[8] The Court, of course, notes that the identification of those officials whose decisions represent municipal policy is not a question of fact; it is a question of law to be determined by the Court.  See  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1480 n. 10 (11th Cir. 1991); see also id. ("Whether a particular official has final policymaking authority is a question of state law").  The burden is therefore on Plaintiffs, and not on the City, "to establish the identity of the final policy maker on part of the local governmental unit." Sullivan v. Chastain, 2005 WL 9844348 *6 (W.D. Tex. April 28, 2005).  Significantly, in this case, Plaintiffs have offered no evidence or argument in response to the City's motion for summary judgment so as to establish or even suggest that *final* decisionmaking authority for the hiring and discipline of police officers is vested anywhere other than with the City Council, as alleged and supported by the City.  In as much, Plaintiffs have simply failed to show that §1983 municipal liability may be imposed for Chief Shirley's hiring and disciplinary decisions as a matter of law.

deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Board of County Comm'rs v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382 (1997).

Here, there is no allegation that the City or Chief Shirley directly inflicted Reed's injuries; rather, Reed alleges that Shirley's failure to properly supervise, i.e., train and enforce policy, caused Masionet and Carlisle to do so.  In such a case, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id.  "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will have simply shown that the *employee* acted culpably."  Id. at 406 (emphasis in original).  Thus, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Id. at 407; City of Canton v. Harris, 489 U.S. 378, 388 (1989).  "A showing of simple or even heightened negligence will not suffice."  Brown, 520 U.S. at 407.

On summary judgment, the City contends that Reed cannot meet this standard of proof.  With respect to his failure to train claim, Plaintiff Reed claims that the City "provided absolutely no training or supervision over [Officer] Masionet's use or an ASP

baton." (Pl.s' Brief [Doc. 75] at 11).[9]  Reed's allegations, however, are entirely unsupported

by the record. Reed provides no citations and apparently no evidence in support on these

claims.  See Fed. R. Civ. P. 56(e) (requiring that the nonmoving party to go beyond the

pleadings and present specific evidence showing that there is a genuine issue of material

fact).  On the other hand, it is undisputed that the official policy of the City of Lavonia is

that an officer may carry and use an ASP baton if he is properly certified by either a training

officer or the Forsyth Training Academy in their use.  Officer Masionet additionally

testified that he had received ASP training and was awarded a training certificate from ASP

itself prior to this incident. (See Masionet Depo., May 3, 4004, at 167-169).  Plaintiffs have

therefore failed to raise a material question as to whether Masionet's training in this area

was inadequate.

Moreover, a city "is not automatically liable under section 1983 even if it

inadequately trained or supervised its police officers and those officers violated [an

arrestee's] constitutional rights."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.

1998).  As explained by the United States Supreme Court, there are only "'limited

circumstances' in which an allegation of failure to train or supervise can be the basis for

liability under §1983."  Id. (citing Canton, 489 U.S. at 387).  Such circumstances occur

"only where the municipality inadequately trains or supervises its employees, this failure

---

[9] In his response brief, Plaintiff Reed likewise claims that "the City of Lavonia Police Department failed to establish criteria for the use of a choke hold by [Officer] Carlisle."  This allegation, however, is not addressed by the City in its motion for summary judgment, and neither party has cited this Court to any evidence with respect to such a claim.  Any allegation that the City failed to properly train its officers in the use of "choke-holds" will accordingly not be addressed in this Order.

to train or supervise is a city policy, and that a city policy causes the employees to violate a citizen's constitutional rights." Id.

A plaintiff may prove such a policy by showing that the municipality's failure to train was tantamount to "deliberate indifference." Id. To meet this burden "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Id. "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise." Id. at 351; see e.g., Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (finding no liability for failure to train where there was "no evidence of a history or widespread prior abuse" to put the sheriff on notice that improved training or supervision was needed); Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).

In this case, Plaintiffs fail to point to any specific evidence to suggest that the City was somehow on notice that additional baton training for Officer Masionet was needed. There is no evidence of previous complaints about baton abuse or other claims that Masionet was excessively abusive to arrestees while working for the City of Lavonia. Plaintiffs only vaguely allege that Masionet's previous employment history placed Chief Shirley on notice that Masionet was more inclined to use excessive force during an arrest. The Eleventh Circuit has held, however, that a city is not deemed to have notice of past police misconduct if the plaintiff "never demonstrated that past complaints of police misconduct had any merit." Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987). The

32

panel even added that "the number of complaints bears no relation to their validity."  Id.

Here, Plaintiffs apparently rely on the fact that Officer Masionet was accused of using excessive force prior to his employment with the City of Lavonia.  Even so, the undisputed record establishes that neither of these excessive force complaints were found to have any merit at the time they were investigated, and no disciplinary action was taken against Masionet as a result of these allegations.  Moreover, neither of these previous complaints involved the use of an ASP baton.  Such allegations may not serve as notice to the City of a need to re-train Officer Masionet in ASP baton use.  This Court thus finds that Plaintiffs have further failed to provide any evidence suggesting that Chief Shirley had knowledge that baton training was needed but deliberately chose not to provide it.  The City is accordingly entitled to summary judgment on Reed's failure to train claim.

With respect to his failure to enforce claim, Reed shows that Chief Shirley had a written policy addressing the use of audio and video equipment in patrol vehicles.  According to this policy "all video cameras installed in Departmental vehicles will be active whenever the emergency lights are activated and will remain operational until emergency lights used are disconnected or until the system is manually overridden."  The policy further requires that all officers "ensure that the audio is activated whenever the camera is recording."  Chief Shirley also wrote memorandums reminding all officers to activate their video and audio devices when making traffic stops and threatening that their failure to do would result in "extreme consequences."  Shirley, however, failed to issue any discipline related to the misuse of the equipment. Plaintiffs also allege that Shirley knew the equipment was frequently breaking down, but failed to have it repaired, and thereby

33

condoned the practice of stopping vehicles when the video equipment was inoperable - permitting officers to act without accountability.

For the reasons discussed above, Chief Shirley cannot be considered the final policymaker in regards to any disciplinary action taken against his officers. (See p. 28, *supra*.)  Thus, Plaintiffs may not proceed on a claim seeking to hold the City liable for Shirley's failure to discipline his officers for not complying with the policy to use audio and video equipment during every traffic stop.   Of course, it is undisputed that Officer Masionet's video camera was inoperable during the incident giving rise to the present case, and that Officer Masionet was aware that his camera was not recording his actions when he used the ASP baton on Reed.  Chief Shirley was also allegedly aware that the cameras in some patrol cars were malfunctioning and that effected officers, like Masionet, were nevertheless making traffic stops.  As such, Plaintiffs also seek to impose liability on the City of Lavonia in this case for Shirley's failure to maintain the video cameras.

The Court finds this theory of liability entirely unpersuasive.  Again, in a case like the one at bar, "rigorous standards of . . . causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Brown, 520 U.S. at 405; see also Dixon v. Burke County, 303 F.3d 1271, 1275 (11th Cir. 2002) (stating that a §1983 plaintiff "must establish an adequate causal link between the alleged harm and the alleged unlawful conduct").   The causation element simply has not been met with respect to this claim.  Plaintiffs have not pointed this Court to any evidence that Shirley's failure to maintain the video equipment in his officers' patrol cars was the proximate cause of Reed's injuries.  Officer Carlisle's camera was in working order and did in fact record the

events at issue.  There is no evidence that Officer Masionet believed that Carlisle's camera was inoperable, and thus would have acted differently if he knew for a fact that it was working. Carlisle likewise admits that he did not know that his camera was recording the events, but there is no evidence that he believed it was off either.  Plaintiffs allegations that the officers were somehow emboldened to offend Reed's constitutional rights because they knew that their actions were not being recorded on December 25, 2001 are no more than raw speculation.  Plaintiffs, accordingly, have not raised a genuine issue as to whether Shirley's failure to maintain the video equipment proximately caused Reed's injuries, and thus summary judgment in favor of the City would also be appropriate on this supervision claim.  In fact, for all the aforementioned reasons, Plaintiff has failed to raise a triable issue as to any of its claims against the City of Lavonia.  Summary Judgment is therefore **GRANTED** as to Counts II & III of the Complaint.


## C.  Count V - Pendent State-Law Claims

Both Plaintiffs additionally allege state-law claims against the individual Defendants Masionet and Carlisle. Bobby Reed specifically asserts pendent state-law claims of battery and intentional infliction of emotional distress against Masionet for his actions in using the ASP baton to strike him in the groin area during the arrest.  Plaintiff Melissa Reed has likewise stated a claim for assault against Officer Carlisle, for his actions in unnecessarily deploying pepper spray in close proximity to her, and a claim for loss of consortium, arising, of course, out of her husband's injuries.  Through the present motion, Defendants contend that Plaintiffs' state-law claims fail as a matter of law because Officers

Masionet and Carlisle are shielded by "official immunity."  Defendant Masionet further contends that even if he is not entitled to official immunity from suit, Reed's claim for intentional infliction of emotional distress still fails because there is insufficient evidence that he acted intentionally or recklessly by conduct that is extreme and outrageous, and that Melissa Reed's loss of consortium claim must necessarily fail if Reed's battery claim fails.

### 1. Official Immunity.

Defendants are correct that, under Georgia law, an officer vested with discretion and empowered to exercise his judgment in matters before him will usually enjoy "official immunity" from liability for injuries caused by his actions - provided that he acted within the scope of his authority and without actual malice or an intent to cause the injury.  See Tittle v. Corso, 256 Ga. App. 859, 861-62, 569 S.E.2d 873 (2002).  It is undisputed in this case  that Officers Masionet and Carlisle both acted within the scope of their authority and were performing an official discretionary function when they seized and arrested Bobby Reed.  The issue on summary judgment, however, is whether Plaintiffs have identified sufficient evidence to suggest that the officers acted with "actual malice or an intent to cause injury" when they utilized pepper spray and the ASP baton to seize Reed.

With respect to Bobby Reed's claims against Officer Masionet, the Court finds that Plaintiffs have in fact met their burden. Given Plaintiffs' version of the events occurring on December 25, 2001, a jury could possibly find that Masionet maliciously attacked Reed with the ASP baton when he arrived on scene, despite Reed's  lack of resistance.  The facts additionally show that Masionet continued to deliver blows with his ASP baton after Reed was on the ground, and Reed interprets the video evidence to suggest that Masionet, at one

time, even spread Reed's legs apart so that he could have a better shot a striking Reed in the groin area. Masionet himself admits that, during his ASP baton training, he was taught not to strike suspects in the groin area because "it can cause serious bodily injury or death." (Masionet Depo. at 170). The Court accordingly finds that Officer Masionet is not entitled to official immunity as a matter of law because a jury could conclude that his actions in this case were carried out with the intent to cause Reed serious injury.

Plaintiff Melissa Reed, however, has not met her burden of establishing that Officer Carlisle acted maliciously or with the intent to injure her when he deployed pepper spray in close proximity to where she was seated. There is no evidence that Carlisle directed the spray at Melissa Reed or otherwise intended her any harm. Thus, while Carlisle may have acted negligently in deploying pepper spray in close vicinity to Melissa Reed, he is nonetheless immune from liability for this action because he did not act with the intent to frighten or otherwise injure her. Summary judgment in favor of Officer Carlisle is accordingly due to be **GRANTED** with respect to Melissa Reed's assault claim.

### 2. Intentional Infliction of Emotional Distress & Loss of Consortium Claims.

Officer Masionet finally contends that, even if he is not entitled to official immunity from suit, Reed's claim for intentional infliction of emotional distress still fails because there is insufficient evidence that he acted intentionally or recklessly by conduct that is extreme and outrageous, and that Melissa Reed's loss of consortium claim must necessarily fail if Reed's battery claim fails. As discussed above, Reed's battery claim is not foreclosed by Masionet's defenses of official or qualified immunity; Melissa Reed's claim for loss of consortium thus remains viable. Regarding Reed's emotional distress claim, the

law is clear that such a claim requires a showing that the "defendant intentionally or recklessly, through conduct that is extreme and outrageous, causes severe emotional distress to a plaintiff." Ruble v. King, 911 F. Supp. 1544, 1559 (N.D. Ga. 1995). "Conduct is extreme and outrageous and sufficient to support a claim for intentional infliction of emotional distress if the 'citation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'outrageous'" Id. at 1559 (citing Yarbray v. Southern Bell Tel. & Tel. Co., 261 Ga. 703, 706, 409 S.E.2d 835 (1991)). This is a question of law; summary judgment must be denied, therefore, "[i]f the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress." Yarbray, 261 Ga. at 706.

Upon consideration of Plaintiffs' version of the facts, as discussed above (See pp. 36-37, *supra*), the Court finds that this standard of outrageousness has been met. Masionet is accused of repeatedly and maliciously striking Reed in the groin without provocation and with the knowledge that such action could result in a serious injury or even death. A reasonable jury could certainly find this conduct to be "extreme and outrageous." Of course, at trial Reed must additionally show that his resulting distress was likewise "severe." Yarbray, 261 Ga. at 706. Defendant Masionet contends that Plaintiffs cannot show that Reed's distress was sufficiently severe so as to impose liability; however, the facts of this case clearly speak for themselves. It is undisputed that Masionet's use of force resulted in Reed's loss of a testicle. Reasonable jurors may find that a man's loss of this organ could severely effect his emotional state - his feelings of virility and self-esteem. Reed in fact testified that he still suffers from pain in his groin area, that he is unable to

sustain erections as he was before this incident, and that the injury has damaged his sex life, both in frequency and sensation.  (Deposition of Bobby Reed, May 6, 2004, at 67; 69-70; 75; 90-91; 194).  Based on this evidence, the Court finds that there is in fact a triable issue on Reed's intentional infliction of emotional distress claim.  Masionet's motion for summary judgment is thus **DENIED** as to Plaintiffs' state-law battery, intentional infliction of emotional distress, and loss of consortium claims.

## CONCLUSION

Accordingly, for the aforementioned reasons, Defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part.  Judgment is hereby **GRANTED** in favor of Defendant City of Lavonia with respect to Plaintiffs' claims of negligent hiring, retention and supervision and **GRANTED** in favor of Defendant Carlisle in regard to Plaintiff Melissa Reed's state-law claim for assault. Summary judgment is, however, **DENIED** as to Plaintiffs' claim of excessive force against Defendants Masionet and Carlisle in their individual capacities and as to Plaintiffs' state-law claims of battery, intentional infliction of emotional distress, and loss of consortium against Defendant Masionet.

**SO ORDERED** this 19th day of may, 2005.

S/ C. Ashley Royal_____
**C. ASHLEY ROYAL**
**United States District Judge**

JLR / jec